Filed 6/23/14 Estate of Mapes CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| Estate of JOHN R. MAPES, Deceased. | |
| JOHN R. MAPES, JR., et al., | A136086 |
| Petitioners and Appellants, | (Alameda County Super. Ct. No. P-253702) |
| v. | |
| TONJIA MAPES, | **ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |
| Objector and Respondent. | |

THE COURT:

It is ordered that the opinion filed on June 3, 2014, be modified as follows:

On page 14 of the opinion, second paragraph, second sentence beginning with "It is clear, however, . . ." is changed to read as follows:

Regarding this particular form of professional relationship, however, by incorporation of the Ethics Standards, the Legislature limited the relationship that would be viewed as potentially causing "a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial" to one that existed within two years of the arbitrators appointment. (§ 1281.9, subd. (a), Ethics Stds., std. 7(d).)

The petition for rehearing is denied. There is no change in the judgment.

Dated: _____        _____

Kline, P.J.

1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Estate of JOHN R. MAPES, Deceased. | |
| JOHN R. MAPES, JR., et al.,  Petitioners and Appellants,  v.  TONJIA MAPES,  Objector and Respondent. | A136086  (Alameda County  Super. Ct. No. P-253702) |

Brothers John Jr., Stephen and Clifford Mapes appeal from a superior court order denying their petition to vacate several arbitrator's awards.  They contend the awards should have been vacated due to the arbitrator's failure to disclose his prior professional relationship with counsel for the opposing party in the arbitrations.  We affirm.

**STATEMENT OF THE CASE AND FACTS**

John R. Mapes (decedent) died on November 27, 1999, survived by his wife, Tonjia, and three adult sons from a prior marriage.[1]  In 1993, decedent had executed a will and established a trust, naming Stephen executor of the will and trustee of the trust. The beneficiaries of the trust include appellants, Tonjia, Tonjia's mother, and a number of grandchildren.  Decedent's will was admitted to probate and Letters Testamentary

---

[1]  For convenience, as the parties share the same surname, this opinion will refer to respondent and appellants by their first names.  No disrespect is intended.

1

were issued to Stephen in March 2000. The will devised all of decedent's estate to the trust.

During 2000, disputes arose between Tonjia and appellants, and Tonjia filed a number of petitions for relief. Tonjia was represented by Bette Epstein, of Crosby, Heafey Roach & May (Crosby), and Keith Schiller, of Schofield and Schiller. Stephen, as trustee, was represented by John Hartog. John and Clifford were not represented by counsel.

The parties participated in a settlement conference before Judge Richard Hodge on February 14 and 15, 2001, and reached an agreement, the terms of which were read into the record. Among other matters, the settlement agreement confirmed ownership of property located at 4507 Birchwood Court in Union City to appellants, with Tonjia's mother to have a life estate in that property and the right to live there rent free, and appellants to assume the costs of maintenance, real estate taxes, assessments, insurance, upkeep and operating costs for the property. The trustee was to grant deed an undivided one-half interest in the real property at 5 Sandringham Road in Piedmont to Tonjia, as her community property interest in the residence. Tonjia was to pay half of the expenses related to this property and appellants the other half. To this end, upon entry of the order confirming the settlement agreement, $14,000 (half from Tonjia and half from appellants) was to be deposited into a joint account under the control of the trustee (Sandringham fund). At the beginning of each subsequent calendar year, the parties and the trustee were to agree upon an estimated budget for the costs and expenses expected that year. Within 60 days of entry of the order confirming the settlement agreement, appellants were to pay Tonjia half the appraised fair market value of real property in San Diego in which Tonjia held an undivided one-half interest.

The parties agreed that a new, independent trustee would replace Stephen, and the settlement agreement specified the procedure for choosing the new trustee. The parties further agreed that future disputes concerning the trust would be submitted to binding arbitration before William A. Quinby or another arbitrator selected by Quinby. Quinby

2

had been a partner at Crosby until July 1996, when he left the firm to become an arbitrator. At Crosby, Quinby had been a member of the firm's Business Litigation Practice Group and chaired the firm's Alternative Dispute Resolution Practice Group. The settlement agreement provided for reasonable attorney fees to the prevailing party if any judicial remedy or arbitration was necessary to enforce or interpret the agreement or any party's rights and duties.

Judge Hodge explained that the settlement agreement would be binding once the terms were placed on the record. Clifford, who was not present for the second day of the settlement conference, would also be bound because he had delegated his authority to Stephen as his agent. After the terms were placed on the record, each of the parties verbally agreed to be bound by those terms. Judge Hodge stated his opinion that the terms were fair and advised the parties to live with the deal and not make life miserable for each other. The court's order approving the settlement agreement and modifying the trust was filed on May 7, 2001.

By letter dated July 16, 2001, to Quinby, Tonjia requested arbitration pursuant to the settlement agreement, stating that appellants had not paid her the money due for the San Diego property or performed repairs for the Birchwood Court property that were required by the settlement agreement, and owed her legal fees and expenses for the appraisal of the San Diego property. The enclosures sent with this letter included the Settlement Agreement and the order approving it, which reflected Epstein's representation of Tonjia in the settlement proceedings. So far as the record discloses, this was the point at which Quinby had notice he had been appointed to arbitrate disputes arising under the settlement agreement.

After a hearing on July 27, 2001, at which the parties appeared without counsel, Quinby issued an award requiring appellants to perform the required repairs within 30 days, to pay Tonjia $225,000 (half the market value of the San Diego property), with interest, and to pay fees and costs of $3,471 ($2,250 for the arbitration fee, $76 for Tonjia's airline ticket to San Diego, $275 for the appraisal, and $870 for attorney fees

3

incurred "in connection with this arbitration"). The award stated that Tonjia had obtained an appraisal of the property within the time specified in the settlement agreement that set the value at $455,000; appellants admittedly did not comply with terms of the settlement agreement but later obtained an appraisal setting the value at $420,000; that the parties asked the arbitrator to place a fair market value on the property; and that after consultation with the appraisers, the arbitrator set the value at $450,000.

Leonard Soloway began acting as successor trustee on August 2, 2001.[2] In May 2004, Soloway requested arbitration due to a dispute with appellants over the budget and money due for the Sandringham fund, accusing appellants of engaging in obstructive behavior and abusing the process that was designed to avoid contentious and costly disputes. According to Soloway's arbitration brief, the parties complied with the trustee's requests for contributions to the fund in 2002 and 2003. At the end of December 2003, the trustee requested payments of $21,000 each from appellants and Tonjia, based on a $42,000 projected budget for 2004. Tonjia remitted $21,000 while John and Stephen, through their attorney Craig Finta, remitted $10,000 and a list of questions about the propriety of various expenses. The trustee responded to the questions in letters to Finta and on March 11 informed appellants they were in default of the settlement agreement. Further correspondence and meetings among the trustee, Finta and Epstein failed to resolve the dispute. In April 2004, appellants formally rejected the trustee's proposed budget for 2004, John and Stephen each paid an additional $85 based on their own proposed budget, and Clifford was notified to pay $5,085, which he eventually paid in December 2004.

According to Soloway, when Quinby responded to his May 2004 request for arbitration by requesting scheduling information and confirmation that all parties agreed to proceed with arbitration, Finta indicated that John and Stephen did not agree and that Finta would not be available until August 9, and challenged Quinby's qualification to act

---

[2] Tonjia states that Soloway was the candidate appellants suggested and she agreed because she knew they would not accept her candidate, Debra Dolch.

4

as arbitrator because his state bar membership was inactive.  State Bar records indicated that Quinby's membership status had been "inactive" since January 1, 2001.  In June, Quinby declined the request for arbitration because he was only available when Finta was not.  Appellants rejected an alternate arbitrator suggested by the trustee in August, then failed to respond when the trustee suggested two other potential arbitrators or Quinby.

Appellants, for their part, believed Soloway was using the Sandringham fund to pay for various expenses not contemplated by the settlement agreement, such as Tonjia's utility bills and improvements to the property rather than solely maintenance and repairs. They claimed that Soloway unilaterally set the budget for 2002 ($35,000) and 2003 ($39,000) after consultation with Tonjia only, not with appellants.  While they paid their designated shares for 2002 and 2003, when Soloway unilaterally set the 2004 budget at $42,000, appellants refused to comply and paid $15,000 (rather than $21,000) to the fund. In January 2004, appellants asked Soloway to explain his practice of paying Tonjia's personal expenses from the fund and he replied that the trust was required to assist Tonjia's occupancy of the residence, which in turn required utilities and basic telephone service.  Appellants attribute the failure of negotiations with Soloway to the trustee's refusal to recognize there were limitations on the use of money in the fund.

On October 13, 2004, John and Stephen filed a petition in probate court seeking removal of the trustee, appointment of a successor trustee, appointment of a successor arbitrator due to Quinby's unavailability, recovery of fund property, and an accounting. At a hearing on January 19, 2005, the court ordered John and Stephen to file papers showing cause as to why the matters raised in their petition were not subject to the arbitration agreement.  No such papers were filed and the petition was dismissed on March 9, 2005.  Meanwhile, the trustee's attorney, Wilfred Roberge, discussed the expenses and proposed 2005 budget with Finta and demanded that appellants each pay $8,915 to defray the amounts still owing for 2004 expenses and some 2005 expenses, which did not include items amounts to which appellants had objected.  This demand was ignored and the trustee took out a line of credit secured by the Sanringham property in

5

order to pay the expenses related to the property. In May, Tonjia demanded that the trustee pursue arbitration and Roberge again asked appellants to participate in arbitration.

On October 4, 2005, John and Stephen filed another probate court petition, seeking a determination that the arbitration clause did not apply to claims against the trustee by beneficiaries seeking removal of the trustee, recovery of fund property and an accounting. In addition to allegations pertaining to the above stated issues, the petition alleged that an actual dispute existed between the parties and the trustee concerning "whether or not William A. Quinby is willing to continue serving as arbitrator as set forth in the Settlement Agreement" due in part to his state bar membership having been inactive since 2001. This petition was initially not served on the trustee, who subsequently filed a response in December. On January 10, while the petition was pending, Quinby activated his bar membership. The petition was dismissed in February 2006.

Meanwhile, on October 27, 2005, the trustee had served his complaint in arbitration. In his arbitration brief, Soloway represented that as of April 2006, appellants owed the trust $55,290.05 in unpaid expenses for the residence plus $65,375.86 in administrative and legal fees.

An arbitration proceeding before Quinby was held in August 2006. As the arbitrator summarized the issues in this second arbitration, the trustee sought recovery of $197,124.44 from appellants for amounts they were required to contribute to the fund and attorney fees and expenses incurred in connection with the dispute, as well as establishment of a more expedited dispute resolution process to deal with future disputes under the settlement agreement. Appellants sought removal of the trustee and recovery of approximately $65,000 in distributions made by the trustee, and reimbursement to the fund of legal fees and expenses appellants claimed were inappropriate. Soloway was represented by William Green and Stephen and John were represented by Finta. Tonjia and Clifford were not represented by counsel but agreed in writing to be bound by the award.

6

In his final award, dated December 26, 2006, Quinby found that the settlement agreement made arbitration the exclusive remedy for disagreements, the trustee made expeditious and good faith efforts to have the disputes arbitrated and appellants "unreasonably resisted" these efforts; and that the trustee's determinations regarding expenses, with the exception of insurance premiums for Tonjia's personal property, did not exceed his discretion. Accordingly, the trustee was entitled to recover $195,555.88 (an amount reflecting deduction of the cost of insurance premiums on Tonjia's personal property), plus interest, as well as $31,803.41 for attorney's fees and costs of the arbitration. Appellants' request for removal of the trustee was denied, as was the request to recover distributions (with the exception of the insurance premiums just mentioned). Quinby directed the parties, consistent with the process specified in the settlement agreement, to attempt in good faith at the beginning of each calendar year to agree on the estimated budget for that year and, if agreement could not be reached within 30 days, promptly submit the matter for resolution by arbitration.

Appellants assert that following the arbitrator's decision, Soloway refused to provide them with copies of any records of expenditures other than annual accountings; unilaterally raised his hourly rate for services; unilaterally distributed money to Tonjia as interest and charged the interest to appellants; unilaterally delegated many of his duties to his daughter, Lisa Soloway, also a professional fiduciary; denied appellants access to trust records; and never filed a fiduciary income tax return for the trust. Starting in 2007, appellants state, the annual budget for the Sandringham fund has been approximately $85,000.

Soloway died in March 2010, and the parties began to search for a successor trustee. This led to what the parties refer to as the third arbitration. Appellants state that Tonjia asked Quinby to select the successor trustee; Quinby established a protocol under which the parties provided him with nominees in writing by June 28; but on June 30, Quinby unilaterally altered the procedure at Tonjia's request and solicited additional nominations from the parties to be submitted by July 8. Quinby then conducted

7

interviews with the nominees outside the presence of the parties and selected Leo Bautista.[3]

Appellants state that within days of appointing Bautista successor trustee, Quinby requested that Bautista pay approximately $9,800 from the Sandringham fund as Quinby's fee for selecting the trustee, and Bautista did so. Quinby never provided the parties with an invoice or statement itemizing the basis of the fee. Appellants believe that Bautista used money from the fund to pay his personal attorney, and that neither this use of the money nor the payment to Quinby were authorized by the terms of the settlement agreement. After more than six months, Bautista presented a proposed budget for 2011, which appellants claim adopted the "practices of Leonard Soloway without regard for the intent of the parties as set forth in [the February 15, 2001] settlement agreement." Appellants state that they supplied Bautista with multiple qualified contractors to perform services at a cost less than what Tonjia was paying, but Bautista did not contact any of them. When appellants objected to Bautista's budget (projected to exceed $100,000 for 2012), Bautista requested arbitration.

According to John's declaration, on March 25, 2011, he discovered that Quinby was a former member of Crosby, the same law firm as Tonjia's attorney Epstein. No professional relationship between Quinby and Epstein had previously been disclosed to appellants. On April 11, John executed a disqualification of Quinby based on this nondisclosure and served it upon all interested parties, and asked Quinby to resign voluntarily. Quinby resigned by way of an April 13 email, stating that John's position was misplaced because counsel for the parties in the litigation that led to execution of the settlement agreement in 2001 were aware of his professional relationship with Epstein, which had ended in 1996; Epstein did not appear as counsel for any party in connection with the prior arbitration hearings; and Finta, John's counsel in the arbitrations, was

---

[3] Tonjia asserts that Bautista was appellants' choice while she suggested alternative candidates. Appellants are silent on this point, stating only that the parties were unable to agree upon a successor trustee.

8

aware of the relationship. Quinby explained that he was resigning solely because the dispute resolution process established by the parties to resolve issues under the settlement agreement was "too important to become bogged down in quibbling over tangential issues" and the parties should not be wasting money on this issue when they were arguing over important issues concerning the funding of the trust.

Counsel for Bautista, Susanne Cohen, asked Quinby not to resign, as she did not believe there were grounds for disqualification and Quinby was familiar with the parties and the issues. Cohen stated that Epstein had confirmed she was not counsel for Tonjia in the currently pending arbitration and had not been in the two prior arbitrations either. Cohen stated that even if Epstein had served as Tonjia's counsel, based upon Code of Civil Procedure[4] section 1281.9 and its incorporation of the requirements of section 170.1, Quinby would be disqualified only if he had a professional association with a lawyer in the proceeding within two years of the proceeding, and his association with Crosby ended five years before his appointment as arbitrator. Quinby confirmed his resignation because he believed resolving the issue would cost the parties more time and money than selecting a new arbitrator.

In August 2011, Clifford filed a petition to vacate the three arbitration awards on the ground that Quinby had not disclosed his previous professional relationship with Epstein and, had he done so, Clifford would not have agreed to Quinby's appointment. The petition alleged that both Quinby and Epstein had been partners at Crosby, "working in the estate planning section, which Mr. Quinby managed." The petition claimed Quinby was required to disclose the relationship under sections 170.1, subdivision (a)(6), 1281.9, subdivision (a)(1), and 1281.9, subdivision (a)(6), and that Quinby's nondisclosure required that the awards be vacated pursuant to section 1286.2, subdivision (a)(6). The petition noted that Quinby was not an active member of the state bar between

---

[4] All further statutory references will be to the Code of Civil Procedure unless otherwise specified.

9

January 1, 2001, and January 10, 2006, and did not disclose this fact, but did not base any of its argument for vacating the arbitration awards on this issue.

John and Stephen joined Clifford's petition, stating that Quinby's professional relationship with Epstein was never disclosed to them prior to their entering the settlement agreement; that if it had been disclosed, they would not have agreed to Quinby as the arbitrator; and that the relationship was not disclosed in advance of any of the arbitrations. The joinder further stated that at the time of the settlement agreement, Quinby's state bar membership was inactive, and that the state bar rules require that a member be active in order to serve as an arbitrator.

Tonjia opposed the petition on the merits, arguing that Quinby was not required to disclose his prior professional relationship with Epstein, that Stephen's attorney was aware Quinby had been a partner at Crosby, and that appellants were aware of Quinby's state bar status in 2006, when they challenged his qualifications to serve in the 2006 arbitration. Tonjia also argued that vacating the awards would be prejudicial in that Soloway, a key witness, died in 2010, real properties had been sold and transferred, and money had been expended that the trust could not repay.

In February 2012, Epstein deposed John Hartog, the attorney who had represented Stephen in the litigation leading to the settlement agreement. Hartog testified that he proposed Quinby to serve as the arbitrator, that he had known Quinby for many years, and that he knew Quinby had been a partner at Crosby until the mid-1990's. He recommended Quinby because he had personal knowledge of his intellectual capabilities and temperament and had spoken with others who had dealt with Quinby professionally and were favorably disposed toward him. He knew Quinby was not a probate lawyer or involved in Crosby's estate planning practice but rather was a commercial litigator. Hartog testified that he recalled telling John, during the 2001 settlement conference, of his relationship with Quinby and, to the best of his recollection, told John that Quinby had been a partner at Crosby, Epstein's law firm and Stephen was present during these conversations.

10

After the deposition, Tonjia filed a response to John and Stephen's joinder in which, among other things, she argued that appellants were aware of Quinby's professional relationship with Epstein because Hartog told John and Stephen about it in 2001 and, in any case, Hartog's knowledge was imputed to his client as a matter of law. Tonjia argued that John and Stephen's knowledge was imputed to Clifford because the brothers were acting as Clifford's agent regarding the settlement agreement.

Stephen stated in a subsequent declarations that Hartog never discussed Quinby with him and John "in any detail" until they were leaving court after entering into the settlement agreement and never said anything about Quinby having been a partner at Crosby. John also declared that Hartog never disclosed the prior professional relationship between Quinby and Epstein and that the conversation Hartog described in his deposition, in which John asked about how the arbitration process would work, occurred as they were leaving court after the settlement agreement was complete.

The petition to vacate the arbitration awards was heard on April 26, 2012, and decided on the parties' pleadings and argument. On May 31, the court filed a lengthy order denying the petition.

## DISCUSSION

Appellants contend the trial court erred in finding that the arbitrator had no duty to disclose his prior professional relationship with Epstein and that appellants waived any failure to disclose.[5] Where the material facts are undisputed, the trial court's determination whether an arbitrator failed to make required disclosures is reviewed de novo. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 383, 388.) Where the facts are

---

[5] Arguing that the court's order denying the petition is not an appealable order and may be reviewed only on appeal from a judgment confirming the arbitration award, respondent urges that we should hold the appeal in abeyance and order the probate court to enter such a judgment. Respondent raised this issue in a motion filed shortly after her respondent's brief. We denied the motion, deeming the court's order to be a final judgment as explained in our July 11, 2013, order. No further discussion on this point is necessary.

11

disputed, " '[w]e must accept the trial court's resolution of disputed facts when supported by substantial evidence; we must presume the court found every fact and drew every permissible inference necessary to support its judgment, and defer to its determination of credibility of the witnesses and the weight of the evidence.' (*Betz v. Pankow* (1993) 16 Cal.App.4th 919, 923.)" (*Fininen v. Barlow* (2006) 142 Cal.App.4th 185, 189-190 (*Fininen*).) This standard of appellate review is the same for a judgment based on affidavits or declarations as it is for a judgment based on oral testimony. (*Fininen*, at p. 189; *Betz,* at p. 923; *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711, fn. 3.)

Section 1281.9, subdivision (a), provides that a proposed neutral arbitrator must disclose "all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial" and sets forth a list of nonexclusive matters required to be disclosed. (§ 1281.9, subd. (a).) The one upon which appellants rely is section 1281.9, subdivision (a)(6), under which the proposed arbitrator must disclose "[a]ny professional or significant personal relationship the proposed neutral arbitrator or his or her spouse or minor child living in the household has or has had with any party to the arbitration proceeding or lawyer for a party." Also of relevance here, the proposed arbitrator must disclose "[t]he existence of any ground specified in Section 170.1 for disqualification of a judge" (§ 1281.9, subd. (a)(1)) and "[a]ny matters required to be disclosed by the ethics standards for neutral arbitrators adopted by the Judicial Council pursuant to this chapter" (§ 1281.9, subd. (a)(2)).

Section 1281.9 was originally enacted in 1994. (Stats. 1994, ch. 1202, § 1 (Sen. Bill No. 1638).) The language requiring disclosure of "any professional or significant personal relationship" has been part of the statute since a 1997 amendment, as has the requirement for disclosure of any ground specified in section 170.1 for disqualification of a judge. (Stats. 1997, ch. 445, § 2 (Assem. Bill No. 1093).) The requirement for disclosure of any matters required to be disclosed by the ethics standards, as well as the introductory language regarding "all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be

12

impartial," were added to the statute by amendment in 2001. (Stats. 2001, ch. 362, § 5 (Sen. Bill No. 475).) The same 2001 legislation added section 1281.85, directing the Judicial Council to adopt ethical standards with which neutral arbitrators would be required to comply beginning on July 1, 2002. (Stats. 2001, ch. 362, § 4.)[6] Accordingly, the California Judicial Council adopted the Ethics Standards for Neutral Arbitrators in Contractual Arbitration,[7] in order to "establish the minimum standards of conduct for neutral arbitrators who are subject to these standards."[8] (Ethics Stds., std. 1(a).)

Appellants read section 1281.9, subdivision (a)(6), as requiring disclosure of *any* professional relationship, no matter how attenuated, because the text of the statute refers to "any" professional relationship while limiting the required disclosure of personal relationships to "significant" personal relationships. The statute does not define "professional relationship." Case law, however, has viewed the "professional relationship" triggering a duty of disclosure as involving some degree of significance and substantiality. (*Guseinov v. Burns* (2006) 145 Cal.App.4th 944, 958-959 [arbitrator having acted as uncompensated mediator in prior matter where lawyer for party to

---

[6] Section 1281.85 provides: "Beginning July 1, 2002, a person serving as a neutral arbitrator pursuant to an arbitration agreement shall comply with the ethics standards for arbitrators adopted by the Judicial Council pursuant to this section. The Judicial Council shall adopt ethical standards for all neutral arbitrators effective July 1, 2002. These standards shall be consistent with the standards established for arbitrators in the judicial arbitration program and may expand but may not limit the disclosure and disqualification requirements established by this chapter. The standards shall address the disclosure of interests, relationships, or affiliations that may constitute conflicts of interest, including prior service as an arbitrator or other dispute resolution neutral entity, disqualifications, acceptance of gifts, and establishment of future professional relationships."

[7] Subsequent references to "Ethics Standards" or "Standard" will refer to the Ethics Standards for Neutral Arbitrators in Contractual Arbitration.

[8] The Standards apply to "all persons who are appointed to serve as neutral arbitrators on or after July 1, 2002, in any arbitration under an arbitration agreement," if the agreement is subject to the provisions of the California Arbitration Act (§ 1280 et seq.) and the hearing is to be conducted in California. (Ethics Stds., std. 3(a).)

13

arbitration represented a party unrelated to current arbitration insufficient to constitute professional relationship within meaning of § 1281.9, subd. (a)(6)].)  " 'In general, significant or substantial business relationships between the neutral arbitrator and a party or his representative must be disclosed to the other party, to avoid the appearance of impropriety, but ordinary and insubstantial business dealings do not necessarily require disclosure.  [Citation.]  Because arbitrators are selected for their familiarity with the type of business dispute involved, they are not expected to be entirely without business contacts in the particular field, but they should disclose any repeated or significant contacts which they may have with a party to the dispute, his attorney or his chosen arbitrator.' " (*Guseinov*, at p. 959, quoting *Figi v. New Hampshire Ins. Co.* [(1980)] 108 Cal.App.3d [772,] 775-776; *Nemecek & Cole v. Horn* (2012) 208 Cal.App.4th 641, 646-647 [disclosure not required under § 1281.9, subd. (a)(6) based on arbitrator being on same bar association committee as member of law firm party to arbitration and expert witness for that party in arbitration].)  " '[T]o create an impression of possible bias that therefore requires disclosure, a business relationship must be substantial and involve financial consideration.' " (*Luce, Forward, Hamilton & Scripps, LLP v. Koch* (2008) 162 Cal.App.4th 720, 732 [arbitrator having served on bar association boards of directors with expert witness and with attorney for party to arbitration not professional relationship requiring disclosure], quoting *Michael v. Aetna Life & Cas. Ins. Co.* (2001) 88 Cal.App.4th 925, 940.)

With respect to the specific question framed by appellants—the interpretation of "any professional relationship" as used in section 1281.9, subdivision (a)(6), with reference to an arbitrator's past practice in the same law firm as a lawyer representing one of the parties in the arbitration—the parties have not provided us with authority on point and we have found none.  It is clear, however, that where the Legislature specifically considered this form of professional relationship, it limited the reach of the relationship that would be viewed as potentially causing "a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be

14

impartial" (§ 1281.9, subd. (a), Ethics Stds., std. 7(d)) to one that existed within two years of the arbitrator's appointment. Standard 7(d) provides that "[a] person who is nominated or appointed as an arbitrator must disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed arbitrator would be able to be impartial." The list of required disclosures enumerated in this Standard includes, "[t]he arbitrator was associated in the private practice of law with a lawyer in the arbitration within the last two years." (Ethics Stds., std. 7(d)(8)(A)). The two-year limitation is also apparent in section 170.1, the disqualification standards of which are specifically incorporated into section 1281.9. (§ 1281.9, subd. (a)(1).) Section 170.1 provides that a judge "shall be disqualified" if the judge "served as a lawyer in the proceeding" (§ 170.1, subd. (a)(2)(A)), and specifies that a judge "shall be deemed to have served as a lawyer in the proceeding if *within the past two years*: [¶] . . . [¶] [a] lawyer in the proceeding was associated in the private practice of law with the judge." (§ 170.1, subd. (a)(2)(B)(ii), italics added.) Applied to the present case, both Ethics Standard 7(d) and Code of Civil Procedure section 170.1, subdivision (a)(2), put a specific temporal limit on the required disclosure: Quinby would be required to disclose his past association as a member of the same law firm as Epstein only if that association occurred within the two years preceding Quinby's appointment.

Appellants maintain that the provisions of section 1281.9, subdivision (a)(2)—referring to the Ethics Standards—cannot supplant or override the separate disclosure requirements of section 1281.9, subdivision (a)(6). Reading the latter, as we have said, as requiring disclosure of any and all professional relationships, appellants point out that in authorizing the Judicial Council to develop the Standards, the Legislature expressly stated that the Standards "may expand but may not limit the disclosure and disqualification requirements established by this chapter." (§ 1281.85.) When section 1281.85 was enacted in 2001, section 1281.9 already required disclosure of "any professional relationship." Further, the Standards did not become effective until July 1, 2002

15

(§ 1281.85), which was after Quinby was appointed arbitrator in the 2001 settlement agreement, so appellants maintain they cannot be applied to Quinby.

These arguments beg the question, as they depend upon the initial assumption that section 1281.9, subdivision (a)(6), was intended to and does refer to "any" professional relationship without substantive or temporal limitation. As we have said, the cases uniformly reject this interpretation.

We need not decide here whether the disclosure requirement of section 1281.9, subdivision (a)(6), for professional relationships, as applied to membership in a law firm, is specifically limited to two years, as under section 170.1, subdivision (a)(2)(B)(ii), and Ethics Standard 7(d)(8). Here, Quinby left Epstein's law firm in July 1996, more than four and a half years before he was appointed in the settlement agreement (agreed to in February 2001 and confirmed by the court in May 2001) to arbitrate potential future disputes between the parties, five years before the first actual arbitration proceeding, a full decade before the second arbitration hearing, and 14 years before the third and final arbitration at issue here. Not only was any relationship between Quinby and Epstein based on their practice at the same law firm attenuated in time, but there is nothing in the record to suggest the two in fact worked together. (See *Johnson v. Gruma Corp.* (9th Cir. 2010) 614 F.3d 1062, 1068-1069 [disclosure not required under California law where wife of arbitrator was partner at law firm of counsel for party to arbitration, and listed as co-counsel on at least one case, eight years before arbitration].) Contrary to appellants' characterization in the trial court, Quinby and Epstein were not part of the same practice groups at Crosby: Quinby was a member of the Business Litigation and Alternative Dispute Resolution Practice Groups and Epstein was in the Trust and Estate Practice Group.

Additionally, while Epstein represented respondent in the proceedings that resulted in the settlement agreement, she did not represent respondent in any of the actual

16

arbitration proceedings.[9] Section 1281.9, subdivision (a)(6), requires disclosure of the specified relationship between the arbitrator and "any party to the arbitration proceeding or lawyer for a party." Standard 2(m) specifies that " '[l]awyer for a party' means the lawyer hired to represent a party in the arbitration and any lawyer or law firm currently associated in the practice of law with the lawyer hired to represent a party in the arbitration." While Quinby was named in the settlement agreement as the arbitrator who would preside if it became necessary to resolve disputes under the agreement in the future, at the time he was contacted to conduct the actual arbitrations—triggering his duty of disclosure—Epstein was not a "lawyer for a party" in the arbitration.

Appellants' position is not assisted by *Mt. Holyoke Homes, LP v. Jeffer Mangels Butler & Mitchell, LLP* (2013) 219 Cal.App.4th 1299 (*Mt. Holyoke*). In that legal malpractice case, after an arbitration award in favor of the defendant law firm, the plaintiff discovered on the internet a resume in which the arbitrator listed as a reference one of the partners in the defendant law firm. (*Id.* at p. 1306.) The arbitrator had disclosed certain contacts with counsel for the defendants and with one of the plaintiffs in prior mediations or arbitrations, but had said he was not aware of any relationship with any party or attorney in the present matter that would impair his ability to act fairly and impartially. (*Id.* at pp. 1305-1306.) Accepting the arbitrator's statements that he had no personal or professional relationship with the partner listed as a reference, whom he said he listed because the partner was a well-known and highly regarded litigator who was familiar with the arbitrator's abilities as a neutral, and that the resume was prepared 10 years earlier without discussion with the partner, the *Mt. Holyoke* court concluded that an "objective observer reasonably could conclude that an arbitrator listing a prominent litigator as a reference on his resume would be reluctant to rule against the law firm in

<hr/>

[9] The record reflects that Tonjia, not Epstein, contacted Quinby to request arbitration and that correspondence concerning the arbitration proceedings was between Quinby and Tonjia, not Epstein. Epstein again represented Tonjia after appellants initiated their challenge to the arbitrators awards.

17

which that attorney is a partner as a defendant in a legal malpractice action." (*Id.* at p. 1313.) Accordingly, the matter was required to be disclosed under the general requirement of section 1281.9, subdivision (a), to disclose "any matter that reasonably could cause a person aware of the facts to entertain a doubt that the proposed arbitrator would be impartial." (*Mt. Holyoke*, at p. 1311.)

*Mt. Holyoke* provides no guidance on the question of interpretation of "any professional relationship" in section 1281.9, subdivision (a)(6), and appellants suggest no other reason an objective observer would entertain a reasonable doubt as to Quinby's impartiality based upon the fact that he had been a member of the same law firm as Epstein some five years before being named in the settlement agreement.

In any event, the trial court also based its denial of the petition to vacate on appellants' waiver of any failure to disclose, and we would affirm the probate court's decision on this ground as well.

Matters required to be disclosed under section 1281.9 must be disclosed in writing within 10 calendar days of service of notice of the proposed nomination or appointment. (§ 1281.9, subd. (b).) A party entitled to disclosure has 15 days from the time the arbitrator complies or fails to comply with section 1281.9 within which to serve notice of disqualification. (§ 1281.91, subd. (a) & (b)(1).) "The right of a party to disqualify a proposed neutral arbitrator pursuant to this section shall be waived if the party fails to serve the notice pursuant to the times set forth in this section, unless the proposed nominee or appointee makes a material omission or material misrepresentation in his or her disclosure." (§ 1281.91, subd. (c).) Unless a ground specified in section 170.1 for disqualification of a judge exists, "in no event may a notice of disqualification be given after a hearing of any contested issue of fact relating to the merits of the claim or after any ruling by the arbitrator regarding any contested matter." (§ 1281.91, subds. (c) & (d).) "Nothing in this subdivision shall limit the right of a party to vacate an award pursuant to Section 1286.2, or to disqualify an arbitrator pursuant to any other law or statute." (§ 1281.91, subd. (c).)

18

Section 1286.2, subdivision (a)(6), provides that an arbitrator's award "shall" be vacated if the arbitrator "failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware" or "was subject to disqualification upon grounds specified in Section 1281.91 but failed upon receipt of timely demand to disqualify himself or herself as required by that provision."

As the trial court noted in its decision, despite the mandatory language of section 1286.2, subdivision (a)(6), courts have refused to vacate arbitration awards where the party seeking to vacate was aware of the information he or she claims the arbitrator failed to disclose, but did not timely assert his or her rights. In *Fininen*, *supra*, 142 Cal.App.4th 185, the arbitrator had previously mediated a case in which Barlow was a party. Upon his appointment, the arbitrator disclosed that he had previously mediated several cases for the attorneys on both sides of the present case. At the outset of the arbitration, Barlow and the arbitrator recognized each other and Barlow suggested that the arbitrator had presided in a mediation in which he was a party. The arbitrator advised the parties that he had previously mediated a case in which Barlow was a party without specifying the particular case, and all parties waived conflicts and agreed to proceed with the arbitration. Months later, after an award in favor of the opposing parties, Barlow sought to have the award vacated based on the arbitrator's failure to disclose the specific prior mediation, the details of which Barlow had found in his own project files. Recognizing that the literal language of section 1286.2, subdivision (a)(6), could be seen as requiring vacation of the award due to the arbitrator's failure to disclose his participation in the prior mediation involving Barlow, the *Fininen* court held that in the particular circumstances of the case, including that Barlow recognized the arbitrator and had access to the information in his own files, "the trial court reasonably could have concluded that it would be absurd to construe section 1286.2, subdivision (a)(6) to require that the arbitration award be vacated based on an incomplete or untimely disclosure" concerning the prior mediation. (*Fininen*, at pp. 190-191.)

19

*Dornbirer v. Kaiser Foundation Health Plan, Inc.* (2008) 166 Cal.App.4th 831, 834 (*Dornbirer*), upheld the trial court's refusal to vacate an arbitration award where the arbitrator had not fully disclosed the number and specifics of his work in other arbitrations in which Kaiser was a party, but had provided sufficient information to put Dornbirer on notice of any potential for bias. In addition to relying upon *Fininen's* discussion of avoiding absurd results, *Dornbirer* observed that its decision gave "effect to subdivision (c) of section 1281.9, which states that a party waives the right to disqualify a proposed neutral arbitrator if that party fails to meet the time requirements set forth in that section." (*Dornbirer*, at pp. 845-846.) "Interpreting section 1286.2 to permit a party to vacate an arbitration award at the conclusion of the arbitration based on an arbitrator's failure to disclose details such as the dates of prior arbitrations or the awards in prior arbitrations when that party *knew* about those prior arbitrations and did not request additional information or move to disqualify the arbitrator would undermine the purpose of the time limitations imposed in subdivision (c) of section 1281.91. The waiver provision would have no effect because a party could simply wait until the arbitration was over and then move to vacate the award, despite having failed to move to disqualify the proposed arbitrator before the arbitration commenced." (*Dornbirer*, at p. 846.)

In the present case, substantial evidence supports the trial court's conclusion that, at the time the settlement agreement was reached, appellants were aware that Quinby had previously been a partner at Crosby. Hartog, the attorney who represented Stephen in the litigation leading to the settlement agreement, testified in his 2012 deposition that he proposed Quinby to serve as the arbitrator, that he had known Quinby for many years, and that he knew Quinby had been a partner at Crosby until the mid-1990's. Hartog recalled telling John, during the 2001 settlement conference, of his relationship with Quinby; to the best of his recollection, he told John that Quinby had been a partner at Crosby, Epstein's law firm, and Stephen was present during these conversations. Asked how good his recollection was, Hartog said that he remembered the conversation "more clearly" because John was "very direct" in questioning him, "very focused" about the

20

effect of the settlement agreement and "very concerned" about how it would work, which "made an impression" upon Hartog. Hartog particularly remembered discussing with John whether Quinby could do the job properly and could "handle Tonjia Mapes." Hartog did not think Quinby's prior relationship with Epstein was going to present any problem. Although Stephen and John categorically denied Hartog having told them of Quinby's past practice at Crosby, the trial court accepted the truth of Hartog's testimony.

Appellants attempt to undermine the probate court's determination of credibility by arguing that Hartog testified to having conversations with John in open court, but the alleged conversations are not reflected in the transcript of the hearing at which the settlement agreement was entered. The first conversation was about Quinby's association with Crosby, and the second was one of the two conversations Hartog testified was "clearest" in his memory, which involved John's question when the agreement would become effective.

Concerning the first point, we do not read Hartog's testimony as saying the conversation about Quinby occurred in open court. The transcript of the deposition reflects that Hartog was asked what contact he had with John and responded, that John "attended several meetings I had with Mr. Stephen Mapes" and "was present at the settlement conference in Judge Hodge's chambers when the matter was ultimately resolved and the settlement put on the record. And Mr. John Mapes was present in court at that time because I do recall talking to him in open court at that time." Hartog was then asked, "[D]o you recall if you told John Mapes that Mr. Quinby had been a partner at Crosby, Heafey, Roach & May?" Hartog replied, "Yes." The next question was, "And was Stephen Mapes present during the course of those conversations with John Mapes, Jr.?" and Hartog replied, "To the best of my recollection." The transcript thus reflects that Hartog recalled more than one conversation with John, at least one of which occurred in "open court," but Hartog did not state that the conversation concerning Quinby occurred in open court.

21

As to Hartog telling John the settlement agreement became effective "right now," the fact that this conversation took place during the recitation of the settlement agreement, does not necessarily mean it would be reflected in the transcript. The transcript is punctuated with "short discussion[s] off the record," including one that occurred during an on-the-record discussion about when the agreement would become binding. Anything that was said between Hartog and John during these off-the-record discussions would not have been captured by the court reporter. Indeed, toward the end of the hearing the court suggested the parties consult with their lawyers about any questions they might have, after which the transcript notes a "short discussion off the record" followed by the court asking if there were any additional modifications and then stating, "I observed that the lawyers were talking to their clients for at least 20 minutes. So, I assume that any questions have been resolved; is that a fair statement?"

Appellants rely heavily on this court's decision in *International Alliance of Theatrical Stage Employees, Etc. v. Laughon* (2004) 118 Cal.App.4th 1380 (*Laughon*) to argue that the trial court erred in finding appellants waived their nondisclosure argument. The issue in *Laughon* was the failure of the arbitrator to disclose that he had previously arbitrated a dispute in which one of the parties (a union) was represented by counsel for a party (a different union) in the current arbitration. (*Id.* at p. 1383.) Toward the end of the first day of the current arbitration, counsel for the union offered as an exhibit the decision the arbitrator had rendered in the prior arbitration. (*Ibid.*) After an award largely in favor of the union, the opposing party successfully petitioned to vacate the award based on the arbitrator's failure to make the required disclosure. (*Id.* at p. 1384.) The trial court viewed the opposing party as having waived the issue by failing to object to the lack of disclosure, or the arbitrator's continued participation, after the prior case was " 'mentioned.' " (*Ibid.*) This court reversed because there was no explicit disclosure: The exhibit that could have alerted the opposing party that counsel for the union had represented a party in the prior proceeding was offered merely as a prior decision by the arbitrator supporting the union's position; although "close scrutiny" of the proffered

22

exhibit would have revealed that counsel for the union had been counsel for the union in the prior case, this was not called to the opposing party's attention and there was no evidence to support the trial court's speculative conclusion that the opposing party was aware of the nondisclosure and chose not to object. (*Id.* at pp. 1388 & fn. 4, 1390.)

Unlike the situation in *Laughon,* where the evidence did not support a conclusion that the party seeking to vacate the arbitration award had actual knowledge of the facts at issue, in the present case the evidence accepted by the trial court demonstrates that appellants were affirmatively told the facts they claim the arbitrator should have disclosed. We recognized in *Laughon* that an arbitration award need not be vacated where the party claiming nondisclosure had timely knowledge of the matter the arbitrator failed to disclose. (*Laughon*, *supra*, 118 Cal.App.4th at p. 1391.)

Substantial evidence supports the probate court's conclusion that at the time the settlement agreement was being finalized, Hartog told John, in Stephen's presence, that Quinby had previously been a partner at the law firm where Tonjia's attorney practiced. Although Hartog never spoke with Clifford, Judge Hodge expressly found, at the time of the settlement agreement, that Clifford had made his brothers his agents and therefore was fully bound by the settlement. An "agent's knowledge is imputed to the principal even where . . . the agent does not actually communicate with the principal, who thus lacks actual knowledge of the imputed fact." (*Herman v. Los Angeles County Metropolitan Transportation Authority* (1999) 71 Cal.App.4th 819, 828 (*Herman*); Civ. Code, § 2332.)

Appellants contend imputed knowledge is insufficient here because section 1281.9, subdivision (b), requires that the arbitrator make written disclosure to "all parties," thereby imposing a requirement of "actual knowledge" by all parties, not merely constructive knowledge. They rely upon *Herman*, which held that the time period within which judicial review of an agency's decision may be sought under section 1094.6 is not triggered by service upon a party's attorney because the statute states the period begins when the decision is mailed "to the party seeking the writ." The court noted, among

23

other things, the contrast between section 1094.6 and section 1010, which provides generally for service of notices and papers " 'upon the party or attorney.' " (*Herman*, *supra*, 71 Cal.App.4th at p. 827.) The express language of section 1094.6, and its legislative history, precluded reliance upon the general agency principle that an attorney's knowledge is imputed to the client. (*Herman*, at pp. 828, 830.)

The issue in the present case, however, is not whether a required disclosure made to a party's attorney can be imputed to the party. In the context of our present discussion, the question is whether the actual knowledge of a party serving as agent for another party may be imputed to that other party. *Herman* is inapposite on this point. The same is true of *California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2008) 163 Cal.App.4th 853, 856-857, upon which appellants also rely, which held that the statute of limitations for filing a workers' compensation claim was tolled where the employer did not advise the employee of his rights as required by law and failed to prove that the employee had actual notice of his rights.

Appellants suggest that *Gray v. Chiu* (2013) 212 Cal.App.4th 1355 (*Gray*) is "consistent" with their view that section 1281.9's requirement of disclosure to the "parties" precludes imputing John's and Stephen's awareness of the facts to Clifford. *Gray* involved the failure of an arbitrator to comply with the requirement of the Standards that he disclose that the attorney for one of the defendants in a malpractice case worked for the same dispute resolution provider organization (DRPO). (*Gray*, at p. 1358; Ethics Stds., std. 8(b)(1)(A).) The nine-day arbitration took place at the DRPO office, where hallways and meeting areas displayed posters with photographs and names of panel members, including the attorney, brochures throughout the office included the attorney's name and biographical information and, according to the attorney's declaration, he saw the plaintiff's counsel reviewing these brochures during the arbitration. (*Gray*, at p. 1360.) Appellants rely on the discussion in *Gray* of the requirement that the arbitrator personally make the required disclosures, rejecting the argument that the plaintiff was estopped from seeking to vacate the award because the information had been otherwise

24

disclosed. But *Gray* involved no issue of knowledge imputed on the basis of agency, and therefore does not further appellants' argument that the information Hartog provided to John and Stephen cannot be imputed to Clifford in the circumstances of this case.

The *Gray* court went on to reject the "related" argument that the plaintiff "knew or should have known" of the attorney's membership in the DRPO because section 1281.85, subdivision (c), prohibits waiver of the Ethics Standards. (*Gray*, *supra*, 212 Cal.App.4th at p. 1366.) Subdivision (c) of section 1281.85 provides, "The ethics requirements and standards of this chapter are nonnegotiable and shall not be waived." Appellants point out that to the extent the Standards apply to this case—which, in their view, they do not, because Quinby was appointed before the Standards became effective in 2002—section 1281.85, subdivision (c), precludes waiver of the Standards. If the Standards directly apply to this case, of course, there could be no basis for appellants' claim of nondisclosure because of the two-year limitation imposed by Ethics Standard 7(d)(8)(A). Moreover, subdivision (c) did not become a part of section 1281.85 until 2010, well after the time appellants were told of Quinby's association with Crosby and Quinby was named in the settlement agreement and began to serve as arbitrator. (Stats. 2009, ch. 133 § 1 (Assem. Bill No. 1090), eff. Jan. 1, 2010.) Further, the legislative history of the amendment adding subdivision (c) to section 1281.85 reflects that it was aimed at prohibiting contractual waivers of parties' statutory right to disqualify an arbitrator,[10] not at the type of situation at issue in the present case. Nothing in *Gray* is at

---

[10] The Assembly Committee on Judiciary Analysis of Assembly Bill No. 1090, states, "Although it should be clear that [the ethics standards] were established primarily for the purpose of public protection and therefore should not be subject to negotiation or waiver, there have been reported instances of private judging companies imposing and attempting to defend contractual waivers of these obligations, and there have no doubt been unreported instances as well. (E.g., *Azteca Construction, Inc. v. ADR Consulting, Inc.*, 121 Cal.App.4th 1156 (2004); *Jevne v. Superior Court,* 35 Cal.4th 935 (2005).) This bill would settle any doubt on the matter by declaring expressly that arbitrator ethics rules are not subject to negotiation or waiver." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1090 (2009-2010 Reg. Sess.), as introduced Feb. 27, 2009, p. 4.) After

25

odds with the conclusion that appellants are not entitled to have the arbitration awards here vacated on the basis of Quinby's failure to disclose his prior law firm membership when they were aware of this membership in 2001 but only raised their objection in 2011, after Quinby had rendered three awards over the intervening years. (See *Fininen*, *supra,* 142 Cal.App.4th 185; *Dornbirer*, *supra*, 166 Cal.App.4th 831.)

As recently summarized in *Mt. Holyoke, supra,* 219 Cal.App.4th at pages 1313 and 1314, after concluding that a party's *constructive* knowledge of undisclosed facts—based on the theory that the information was readily available on the internet—was insufficient to avoid the consequence of the arbitrator's failure to make a required disclosure: "An arbitrator's failure to make a required disclosure presumably would not justify vacating the arbitrator's award if the party challenging the award had actual knowledge of the information yet failed to timely seek disqualification. (See *Kaiser Foundation Hospitals, Inc. v. Superior Court* (1993) 19 Cal.App.4th 513, 517.) Courts have also held that if the arbitrator disclosed information or a party had actual knowledge of information putting the party on notice of a ground for disqualification, yet the party failed to inquire further, the arbitrator's failure to provide additional information regarding the same matter does not justify vacating the award. (*Dornbirer*[, *supra*,] 166 Cal.App.4th [at p. 842]; *Fininen*[, *supra*,] 142 Cal.App.4th at pp. 190–191; [*Britz, Inc. v. Alfa-Laval Food & Dairy Co*. (1995) 34 Cal.App.4th 1085, 1096–1097].)" (*Ibid*., fn. omitted.)

---

discussing controversial aspects of private arbitration, the analysis states that the proposed bill avoids the controversy "because it is limited only to involuntary waiver of the arbitrator ethics rules." (*Id.* at p. 7.) According to the Senate Judiciary Committee analysis, "[i]n response to instances where an arbitrator has imposed contractual waivers of these obligations, this bill would provide that existing ethical standards and requirements for neutral arbitrators are not subject to negotiation and may not be waived." (Sen. Judiciary Com., Analysis of Assem. Bill No. 1090 (2009-2010 Reg. Sess.), as amended May 12, 2009, p. 1.)

In sum, we find no basis for reversing the probate court's denial of appellants' petition to vacate the arbitration awards due to Quinby's failure to disclose his past affiliation with Epstein's law firm.

At the conclusion of a brief entirely devoted to the argument that the trial court should have vacated the arbitration award under section 1282.6, subdivision (a)(6), due to Quinby's professional relationship with Epstein, appellants devote a single paragraph to the argument that Quinby failed to disclose his lack of qualification to serve as an arbitrator due to his inactive bar membership status from 2001 until 2006. Under rule 2.30 of the Rules of the State Bar of California, "No member practicing law, or occupying a position in the employ of or rendering any legal service for an active member, or occupying a position wherein he or she is called upon in any capacity to give legal advice or counsel or examine the law or pass upon the legal effect of any act, document or law, shall be enrolled as an inactive member."

Although they state that they would never have agreed to Quinby's appointment if they had known of this lack of qualification, appellants do not argue that it provides a separate basis for vacating the awards. Nor did they do so in the trial court, where their arguments addressed the "professional relationship" issue. The record makes clear that appellants were aware of Quinby's inactive bar status in 2005, at the latest, since they raised this issue at that time in the petition by which they sought to avoid the arbitration then being sought by the trustee.[11] They took no action, however, to attempt to vacate the

---

[11] Even then, appellants did not frame the issue as a challenge to Quinby's ability to serve, but only alleged that "an actual dispute exists between the parties and [the trustee] concerning . . . whether or not William A. Quinby is willing to continue serving as arbitrator as set forth in the Settlement Agreement. According to the online records of the State Bar of California, Mr. Quinby has been an inactive member of the State Bar since 2001. Pursuant to Article I, Section 2 of the Rules and Regulations of the State Bar of California, a member must be active in order to serve as a private arbitrator. Further Mr. Quinby has declined to hear at least two prior requests for arbitration, each time indicating that he was unavailable to serve. As a result, the administration of this trust has come to a virtual impasse."

27

2001 award on this basis and it would be far too late to do so now. Quinby's subsequent awards were not subject to any challenge on this basis, as Quinby became an active bar member again before the 2006 arbitration.[12]

## DISPOSITION

The judgment is affirmed.

Costs to respondent.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

---

[12] All this presumably explains why the trial court did not address Quinby's bar status in its lengthy decision, and why respondent did not reply to appellant's short discussion of the point in her brief in this court.

28